IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| MARY SHARON WALKER,<br><br>    Plaintiff,<br><br>vs.<br><br>NEW ENGLAND COMPOUNDING PHARMACY, INC., D/B/A/ NEW ENGLAND COMPOUNDING CENTER,<br><br>and<br><br>IMAGE GUIDED PAIN MANAGEMENT, P.C., D/B/A INSIGHT IMAGING ROANOKE,<br><br>    Defendants. | Civil Action No: 7:12CV00564 |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT IMAGE GUIDED PAIN MANAGEMENT, P.C. D/B/A INSIGHT IMAGING ROANOKE'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

**I.  BACKGROUND**

Plaintiff, by her attorneys, THE MILLER FIRM, LLC, files this Brief In Opposition To Defendant Image Guided Pain Management, P.C. D/B/A Insight Imaging Roanoke's Motion To Dismiss For Failure To State A Claim Upon Which Relief May Be Granted.

Plaintiff filed a complaint in the Roanoke City Circuit Court in the Commonwealth of Virginia on October 23, 2012, against Defendants for injuries and damages suffered after Plaintiff was injected with methylprednisolone acetate, a steroid pain reliever manufactured, distributed and sold by the Defendants.  Specifically, the Plaintiff alleged that the defective

methylprednisolone acetate was contaminated with a fungus, causing Plaintiff to suffer from fungal meningitis.  Jurisdiction and venue were proper in Roanoke City Circuit Court, as Defendant Image Guided Pain Management, P.C., D/B/A Insight Imaging Roanoke (hereinafter "IGPM"), is a Virginia corporation with its principle place of business in Roanoke, Virginia and is, therefore, a citizen of Virginia.  *See*, Compl. at ¶ 4.

On November 15, 2012, Defendant New England Compounding Pharmacy, Inc., D/B/A New England Compounding Center (hereinafter "NECC") removed this action to Federal Court claiming that: (1) Ms. Walker's complaint asserts claims arising under the laws of the United States pursuant to 28 U.S.C. 1331; and (2) that Plaintiff fraudulently joined the Virginia Defendant, Insight, and as a result this Court has subject matter jurisdiction over this action on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Plaintiff subsequently filed her Motion to Remand, arguing that Defendant IGPM was not fraudulently joined and the causes of action stated against it were supported under Virginia law. The motion to remand is still pending.

In the meantime, Defendant IGPM has now filed its motion to dismiss Plaintiff's claims against it under Fed. R. Civ. P. 12(b)(6).  IGPM argues that it cannot be held liable under Virginia law for breach of warranty because it is not a "seller" or "merchant" under the Virginia Commercial Code.  IGPM further argues that Virginia Medical Malpractice Act should apply to Plaintiff's claims because IGPM it is a health care provider.

Based on the authority set forth below, and Plaintiff's Motion to Remand previously filed, Plaintiff respectfully suggests that this Court lacks jurisdiction to consider the merits of IGPM's motion to dismiss because this matter should be remanded to the Roanoke City Circuit Court.  Even if this Court retains jurisdiction over this matter, the motion to dismiss should be

denied. In the alternative, any claims dismissed should be without prejudice and with leave to file an amended Complaint.

## II.  ARGUMENT

### A.  The Court Lacks Jurisdiction to Consider the Defendant's Motion to Dismiss.

As a preliminary matter, Plaintiff requests that the Court decline to consider the Defendant's Motion to Dismiss until the question of federal jurisdiction is resolved.  The plain language of 28 U.S.C. § 1447(c) states: "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." Subject matter jurisdiction "goes to the very power of the court to act." *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 196 (4th Cir. 2008). Because subject matter jurisdiction goes to the very power of the court to act, the United States Supreme Court has emphasized that the court should determine whether or not it has subject matter jurisdiction **as a threshold matter**. *Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998).  Absent subject matter jurisdiction, this Court cannot rule on the merits of the Defendant's Motion to Dismiss. *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) ("Before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court.) Moreover, determining subject matter jurisdiction at the outset of litigation is usually the most efficient use of judicial resources, and, "in such cases both expedition and sensitivity to state courts' coequal stature should impel the federal court to dispose of that issue **first**." *Ruhrgas AG v. Marathon Oil Company*, 526 U.S. 574, 587-88, 119 S.Ct. 1563, 1572, 143 L.Ed.2d 760 (1999). (Emphasis added).

The Plaintiff contests that there is federal jurisdiction in the present case and has sought remand to the Roanoke City Circuit Court, where the Complaint was initially filed. Determining jurisdiction as a preliminary matter in this case would also conserve judicial resources.  Should the

Court grant the Plaintiff's Motion to Remand, then the present Motion to Dismiss would become moot as the Court lacks jurisdiction to consider the merits of the claim.

Based on the foregoing, the Plaintiff respectfully requests the Court remand this case and deny the Defendant's Motion to Dismiss as moot. *See Pennsylvania v. Consol Energy, Inc.*, 2012 U.S. Dist. LEXIS 124763 (N.D. W. Va. Sept. 4, 2012) ("Accordingly, the Commonwealth's West Virginia common law claims are not completely preempted by the CWA, and this Court lacks jurisdiction to adjudicate this action. As a result, this Court also lacks jurisdiction to decide Consol's motion to dismiss and motion for partial summary judgment, and must accordingly deny the motions as moot, but without prejudice subject to refiling in state court.").

### B.  The Defendant's Motion to Dismiss Should Be Denied.

Should the Court decide to rule on the Motion to Dismiss prior to the Plaintiff's Motion to Remand then the Motion to Dismiss should still be denied. "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.1992). "In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993).

#### 1.  Plaintiff has Alleged Viable Claims for Strict Product Liability Against Defendant IGPM Under Virginia Law.

Defendant IGPM raises many of the same arguments, and relies on the much of the same authority, as NECC did in arguing that this matter should remain in federal court. Insight argues that it may not be subject to liability as a seller of goods under the Virginia U.C.C.

4

IGPM misleadingly argues that Plaintiff's reliance on breach of warranty claims to establish liability has been rejected by Virginia courts. This is simply untrue. No Virginia Appellate or Supreme Court decision has ever considered this issue and, therefore, there is no binding Virginia authority over how this matter should be decided.

To support its argument that "Virginia courts" have rejected such a claim, IGPM cites to two unreported Virginia circuit court opinions: *Gressman v. Peoples Serv. Drug Stores*, Inc., No. LL-692-4, 1998 WL 619115; and *Coffman v. Arthrex*, Inc., 69 Va. Cir. 17 (August. Co. Cir. Ct. 2005); It also cites to a Virginia tax case, *Commonwealth Dep't of Taxation v. Bluefield Sanitarium, Inc.*, 222 S.E.2d 526 (1976). These precise arguments were analyzed at length by the U.S. District Court for the Eastern District of Virginia in *Sanders v. Medtronic, Inc.*, 2006 U.S. Dist. LEXIS 45516 (E.D. Va. 2006). After reviewing the foregoing authority for purposes of determining Medtronic's fraudulent joinder argument, the Court in *Sanders* concluded they do not foreclose claims for breach of warranty under the Virginia U.C.C.

In *Sanders,* the Court decided that it is possible for a defendant health care provider to be liable as a seller of a defective product in Virginia. *Id.* at *30. The Court considered, and rejected, the same authority that IGPM now relies upon to support its arguments in favor of dismissal. For example, the Court in *Sanders* extensively considered *Gressman v. Peoples Service Drug Stores, Inc.,* 10 Vir. Cir. 397 (Va. Cir. Ct. 1988). In *Gressman*, the circuit court held that a pharmacist could not be held liable for breach of warranty for dispensing the wrong drug to the plaintiff because as a "health care provider", the pharmacist was engaged primarily in the business of providing a service, rather than the sale of goods. *Id*. at 409.

The Court in *Sanders* concluded that *Gressman* provided an insufficient legal basis to conclude that Sanders' claim for breach of warranty was foreclosed in Virginia:

5

> As to *Gressman*, the court recognizes that the circuit court found that a pharmacist, as a health care provider, is primarily a provider of services, rather than a seller of goods. However, the court does not feel that a circuit court case from 1988 involving the liability of a pharmacist for breach of warranty is compelling enough for this court to say with certainty that a Virginia court could not reasonably find that Sentara, a hospital, is a "seller" of goods in the instant case. … *Gressman* does not convince this court that a hospital cannot be a "seller" under Virginia law. Accordingly, with respect to Medtronic's argument that Sentara is not a "seller", the court finds that the Virginia case law set forth by Medtronic is insufficient to convince this court there is not a reasonable possibility that a Virginia court could find that Sentara is a "seller" of Medtronic IPG devices in this case."

*Id*. at *20-21.

Defendant also cites *Commonwealth Dep't of Taxation v. Bluefield Sanitarium, Inc*., 222 S.E.2d 526 (1976). *Blue Field Sanitarium* was a tax case, in which the issue before the court was whether the sales tax exemption for purchase of medical supplies applied to private hospitals. *Id*. at 687. The Court held that the provision of the tax code on which the hospital was attempting to avoid paying sales tax was intended to benefit patients, not hospitals engaging in the provision of health care services. *Id*. at 690.

The court in *Sanders* carefully analyzed *Bluefield Sanitarium* and concluded it does not answer the relevant question of whether a health care provider is a seller of goods under the U.C.C.:

> As to Bluefield Sanitarium, this court,…. is concerned by the fact that Bluefield Sanitarium is a tax case which was decided under completely different policy considerations and had nothing to do with a hospital's potential liability for breach of warranty or an individual's right to recover for her injuries. Although the Supreme Court of Virginia might be compelled to consider its analysis in Bluefield Sanitarium in deciding the instant case, *Bluefield Sanitarium* is significantly distinguishable from the instant case for this court to conclude that there is no reasonable possibility that the Supreme Court of Virginia would find that Sentara is not a seller under the U.C.C.

*Sanders*, at *20.

Finally, in analyzing the circuit court's opinion in *Coffman v. Arthrex*, *Inc.,* the Court in *Sanders* found it of little precedential value given the *Coffman* court's acknowledgement that there are no Virginia appellate or supreme court decisions discussing the issue of whether a health care provider may be held liable under a theory of strict product liability:

> The Circuit Court of Augusta County sustained the demurrer, explaining that a hospital is a health care provider, and a "health care provider is not a 'seller' and is not subject to liability on a products liability theory." …. However, in rendering this decision, the circuit court acknowledged that "[t]here apparently is no Virginia case directly on point." [citation omitted]. Furthermore, the circuit court explains that the only case that could possibly "shed some light upon how the Virginia Supreme Court w[ould] rule upon this issue is the case of Commonwealth Department of Taxation v. Bluefield Sanitarium, Inc., 216 Va. 686, 222 S.E.2d 526 (1976)."

*Sanders*, at \*\* 12-14 (E.D. Va. 2006) (citing *Coffman*, 2005 Va. Cir. 143, at \*4).

*Sanders* is directly on point to the present case. No pertinent changes to Virginia law have been made since *Sanders* was decided. Moreover, subsequent analogous Federal Court decisions in other districts have since supported the reasoning in *Sanders*. *See, e.g*., *Phillips v. Medtronic, Inc.*, 2010 U.S. Dist. LEXIS 127961 \*12 (D. Mass. Dec. 1, 2010) (remanding case because there was no definitive state case law as to whether a hospital can be liable on breach of warranty claim); *Snyder v. Davol, Inc.,* 2008 U.S. Dist. LEXIS 1675 (D. Or. Jan. 7, 2008) (remanding case because there was no definitive state case law as to whether a healthcare provider can be liable on a products liability claim).

Moreover, other jurisdictions have held that the sale of medical products to patients by health care providers can constitute a sale of goods for purposes of imposing strict liability. For example, in *Cunningham v. MacNeal Memorial Hosp., 47 Ill. 2d 443, 446-453 (Ill. 1970)* (superseded by statute), the court held that a tainted blood transfusion that was given to a patient constituted a sale of goods, subjecting the hospital to strict product liability:

7

> To assert that the transfusion of whole blood by a hospital into a patient, for which a charge is made, does not give rise to implied warranties because no "sale" is involved is in our judgment simply unrealistic. As noted by the appellate court in this case… "'It seems to us a distortion to take what is, at least arguably, a sale, twist it into the shape of a service, and then employ this transformed material in erecting the framework of a major policy decision.'" (113 Ill. App. 2d 74, 84-85).
>
> * * *
>
> Further, that providing blood for patients is not a hospital's principal function clearly cannot determine, as maintained by defendant, whether it is engaged in the business of selling a product (i.e., blood) for purposes of the imposition of strict liability. Thus, as set forth in the Restatement: "f. Business of Selling. The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products.

*Cunningham,* 47 Ill. 2d at 450-451 (Ill. 1970)

Although *Cunningham* was superseded by statute as it applies to blood transfusions, the Illinois Supreme Court has employed its reasoning to the sale of other medical products by health care providers. *See, e.g.*, *Dubin v. Michael Reese Hospital & Medical Center*, 74 Ill. App. 3d 932, 945 (Ill. App. Ct. 1st Dist. 1979)("we hold that the supply of X-radiation for absorption into a patient for treatment purposes by a hospital, for which a charge is made, places such hospital in the business of introducing such X-radiation in the stream of commerce").

Plaintiff acknowledges this matter is unsettled under Virginia law. However, this is all the more reason to allow the claim to move forward into discovery so Plaintiff can have opportunity to fully develop the factual record in relation to IGPM's status as a seller of prednisolone acetate.

> 2. **The Virginia Medical Malpractice Act is not Applicable to Plaintiff's Allegations of Negligence against IGPM.**

IGPM argues that Plaintiff's claim falls within the Virginia Medical Malpractice Act and, as such, Plaintiff was required to certify that an expert has reviewed her claim and provide a written opinion that IGPM deviated from the standard of care.  However, Plaintiff's allegations of negligence against IGPM do not arise out of any "health care" it provided to her as that term is defined under Va. Code Ann. § 8.01-581.1, which provides as follows:

> "Health care" means any act, professional services in nursing homes, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement.

IGPM's negligent conduct in this case was independent of any health care provided to Plaintiff "during the patient's medial diagnosis, care, treatment or confinement." Rather IGPM's negligence arises out of its failure to use reasonable care in selecting NECC as its supplier of compounded medicines given NECC's well-known history of using improper practices and previous violations of industry standards.  Compl. at ¶¶39-41.  Carelessly procuring mediation from a disreputable supplier is a business and/or administrative practice, not "health care" as that term is defined above.  Moreover, the allegations of the Complaint state that NECC was selling large batches methylprednisolone acetate without individual prescriptions, in violation of Virginia and federal law and industry standards. Compl. at ¶ 38.  Therefore, when IGPM negligently purchased the contaminated methylprednisolone acetate from NECC, it did so independent of any individual prescription for Plaintiff, or any consideration for Plaintiff's individual medical needs.

The Virginia Supreme Court has recognized that not all tort or contract claims by patients against their health providers fall within the Medical Malpractice Act.  In *Alcoy v. Valley Nursing Homes, Inc.*, 272 Va. 37, 630 S.E. 2d 301 (2006), the Court held that the Medical Malpractice Act only applied to tort or contract claims arising out of "health care or professional

services rendered" under the Act and, therefore, did not apply to other tort claims such as an alleged assault by a member of the nursing home's staff:

> By their terms, the definitions of "malpractice" and "health care" apply to patients on an individual basis, rather than to the staffing and security of any medical facility in which the patients are located. As defined in Code § 8.01-581.1, "health care" relates to acts or omissions "on behalf of a patient." Likewise, under the same definitional statute, "malpractice" involves health care or professional services that are rendered or should have been rendered "to a patient." The factual allegations of the administrator's pleadings address conduct unrelated to any health care or professional service that Valley should have rendered to Alcoy individually. Instead, as stated above, the administrator's allegations involve failures relating to proper staffing and security measures for the facility.

*Alcoy*, 272 Va. at 43.

The Court in *Alcoy* further explained that the statutory requirement that a medical expert who testifies as to the standard of care must have an active clinical practice shows that the Act does not apply to negligence claims arising out of administrative decisions by the health care provider:

> The specific statutory requirement that an expert have had an active clinical practice plainly indicates a legislative intent that expert testimony in cases subject to the Act address medical standards of care, rather than standards concerning building security or employment protocols. Therefore, we conclude that the circuit court erred in holding that the administrator's claims were subject to the provisions of the Act.

*Alcoy*, 272 Va. at 43-44.

Other jurisdictions have also declined to apply medical malpractice statutes to claims arising out of the corporate or administrative negligence of health care providers. *See, e.g.*, *Miles Laboratories v. Doe*, 315 Md. 704, , 556, 556 A.2d 1107, A.2d 1107, 1125 (1989) (holding claims against a blood bank "are not for medical malpractice of its employees, but for the organization's failure to adopt proper testing and screening procedures"); *Bleiler v. Bodnar*, 65 N.Y.2d 65, 72, 479 N.E.2d 230, 235, 489 N.Y.S.2d 885, 890 (1985) (a hospital's failure to adopt

and prescribe proper procedures and regulations differs from medical malpractice); *Sweeney v. Presbyterian/Columbia Presbyterian Medical Center*, 763 F. Supp. 50, 51-53 (S.D.N.Y. 1991) (claim that a hospital failed to employ procedures which would have adequately insured that blood it obtained for transfusions was not toxic is not of a nature that calls into question the medical decisions made regarding plaintiff's treatment and therefore is not medical malpractice). *Kaiser v. Memorial Blood Center, Inc*., 486 N.W.2d 762, 767-768 (Minn. 1992) (holding that provision of tainted blood due to failure to properly screen donors was not a claim for medical malpractice but for common law negligence).

Based on the foregoing authority and the allegations of the Complaint, IGPM's negligent selection of NECC as a source for compounded medicines is clearly an administrative and/or corporate function that does not constitute "health care" provided to the Plaintiff. Its decision to select NECC as its source for compounded drugs was unrelated to any treatment it provided specifically to Plaintiff. Therefore, the allegations of negligence and breach of warranty against IGPM set forth in the Complaint to do not fall under the Medical Malpractice Act.

At the very least, any decision regarding this issue is premature given the infancy of this case. Discovery has yet to commence and at this time it is unknown whether the individual at IPGM who was charged with ordering and purchasing the methylprednisolone acetate from NECC was even a medical professional at all. The person ordering such medications may very well have been an office administrator without any medical credentials whatsoever. This is certainly likely given that NECC did not require valid prescriptions before selling compounded medications to their customers in violation of federal and state regulations. Compl. at ¶ 38. Accordingly, IGPM's motion to dismiss the negligence and warranty claims against it on the

grounds that Plaintiff failed to comply with the Medical Malpractice Act should be denied.

### 3. Virginia Code § 54.1-3410 does not Absolve IGPM of its Negligence.

IGPM makes the remarkable argument that because NECC was responsible for compounding the methylprednisolone acetate under Va. Code. § 54.1-3410(2)(D), "there are no set of facts set forth in the Complaint which could implicate liability on behalf of any health care provider, including IGPM." This argument is fatally flawed for several reasons.

Although Va. Code §§ 54.1 3410.2(D) and (E) state that the compounding pharmacy has the obligation to ensure compliance for sterile compounding and the accuracy of formulas, this language in no way provides blanket immunity to IGPM from liability in this case. IGPM knew, or should have known with the exercise of reasonable care, that NECC had a history failing to live up to these standards. NECC has a long history of citations for violating laws like Va. Code § 54.1-3410. Compl. at ¶¶ 40, 41. To suggest that IGPM should be immune from liability for purchasing compounded drugs from a disreputable pharmacy such as NECC simply has no precedent under Virginia law. Such a result would represent an extraordinary abrogation of IGPM's legal duty to use reasonable care in the selection of its medication suppliers. This is likely why IGPM cites no case law in support of its argument.

IGPM further complains that holding it liable for its negligent conduct in this regard "would result in an unduly burdensome set of requirements whereby IGPM and other health care providers would have to independently test all drugs they administer." This argument is wholly without merit. The only burden that Plaintiff seeks to impose on IGPM is its common-law duty to use reasonable care in the purchase of its medications. Undoubtedly, there are many reputable suppliers of prednisolone acetate, including Pfizer, which manufactures it under the brand name Depo-Medrol. AGPM's decision to purchase medication from NECC was a negligent one based

on NECC's poor track record of safety violations, and Va. Code § 54.1-3410 contains no provisions shielding AGPM from such liability.

> **4. The Complaint Alleges Sufficient Facts to State a Claim for Breach of Express Warranty and for Breach of Implied Warranty Of Merchantability.**

Plaintiff has alleged that AGPM breached an express warranty under Virginia Coed § 8.2-313: "Defendants expressly warranted that the methylprednisolone acetate was safe and effective." Compl. at ¶ 47. This allegation, which must be taken as true for purposes of the present motion, satisfies the express warranty provisions of Va. Code § 8.2-313, which provides in relevant part as follows:

> § 8.2-313. Express warranties by affirmation, promise, description, sample
>
> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Defendants' warranty that the methylprednisolone acetate was "safe and effective" satisfies subsection (a) as an "affirmation or promise made by the seller to the buyer which

relates to the goods". It further satisfies subsection (b) as "any description of the goods which is made part of the basis of the bargain".

Defendant's reliance on *Sanders v. Medtronic* in this regard is misplaced. The Court in *Sanders* held that the hospital defendant, Sentara, could not be liable for breach of express warranty because it simply made no representations or warranties of any kind to the plaintiff:

> In this case, the plaintiff alleges in her Motion for Judgment that the defendants provided documentation to the plaintiff that stated the following: "The battery life of the pulse generator depends on the number of hours you use it each day and how strong the stimulation must be to control your pain. Your doctor can give you an estimate once your pulse generator settings have been determined." (Mot. for J. at 12)(emphasis in original). The plaintiff claims that the surgeon responsible for implanting the device gave her a battery life estimate of four to five years.
>
> The problem with the plaintiff's breach of express warranty claim as against Sentara is that the plaintiff has not alleged any facts that suggest that Sentara made any express warranties to the plaintiff regarding the Medtronic IPG devices. Even if Sentara gave the defendant the documentation to which the plaintiff refers, which is not clear from the Motion for Judgment, such documentation does not contain an express warranty. It simply states that her doctor can give her an estimate for the battery life. Furthermore, the plaintiff's surgeon, who is not a party to this case and not an employee of Sentara, gave her the estimation of four to five years.

Sanders v. Medtronic, Inc., 2006 U.S. Dist. LEXIS 45516, 27-28 (E.D. Va. 2006)

Thus, in *Sanders* the doctor who made representations regarding the battery life of the plaintiff's pacemaker was not even a party to the lawsuit. In the present case, AGPM is clearly a defendant in this lawsuit, and expressly warranted to Plaintiff that "the methylprednisolone acetate as safe and effective." Compl. at ¶ 47. Defendant's characterization and application of *Sanders* is this regard is simply inaccurate, and fails to support the dismissal of Plaintiff's express warranty claim.

Under Count IV of the Complaint, Plaintiff further alleges a claim for breach of implied warranty of merchantability under Va. Code § 8.2-314. IGPM's motion to dismiss does not directly address the sufficiency of this warranty claim.

## IV. CONCLUSION

As set forth in Plaintiff's motion for remand filed previously in this matter, the Court lacks subject matter jurisdiction over the present case. Therefore, Plaintiff respectfully requests that the Court remand this matter back to the Roanoke City Circuit Court where it was initially filed, and refrain from deciding the Defendant's motion to dismiss on the merits.

Should the Court decide the present motion to dismiss on the merits, Plaintiff respectfully requests the Court deny the motion or, in alterative, grant leave to file an amended Complaint.

Respectfully Submitted by:

/s/ Jeffrey Travers
THE MILLER FIRM, LLC
Jeffrey Travers, Esq. VSB #77409
108 Railroad Ave.
Orange, VA 22960
Phone: (540) 672-4224
Fax: (540) 672-3055
jtravers@millerfirmllc.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system and that electronic notice and service will be completed through the ECF system to all counsel of record.

/s/ Jeffrey Travers, Esq.

Jeffrey Travers, Esq. VSB # 77409